AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Silver Dell Laptop
Seizure No. - 2024460100030101-0002
("Target Device 2")

Case No.  '23  MJ4175

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 1343 | Wire Fraud |
| 21 USC Sec. 1349 | Conspiracy to Commit Wire Fraud |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brian Holerud, HSI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ November 14, 2023 _____

*Judge's signature*

City and state: San Diego, California

Hon. Barbara L. Major, United States Magistrate Judge

*Printed name and title*

**AFFIDAVIT**

I, Brian Holerud, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I submit this affidavit in support of an application for a search warrant in furtherance of a wire fraud conspiracy and money laundering investigation conducted by HSI for the following target property seized from Carlos Manuel DA SILVA SANTOS:

> Silver i-Phone 13 Pro Max
> Seizure No. 2024460100030101-0001
> (**"Target Device 1"**)

> Silver Dell Laptop
> Seizure No. - 2024460100030101-0002
> (**"Target Device 2"**)

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically Title 18, United States Code, Sections 1343 and 1349, as further described in Attachment B.

2.     **Target Device 1** and **Target Device 2** were seized from DA SILVA SANTOS on November 12, 2023, incident to his arrest at Newark Liberty International Airport ("EWR") pursuant to a federal arrest warrant.  The Target Devices were located in DA SILVA SANTOS' pocket and personal luggage after he was referred to secondary inspection at EWR.

3.     On November 10, 2023, the Honorable Barbara L. Major, U.S. Magistrate Judge in the Southern District of California signed a complaint and authorized a federal arrest warrant for DA SILVA SANTOS. *See* 23-MJ-4145.

4.     After DA SILVA SANTOS's arrest, an HSI Special Agent in Newark, New Jersey seized **Target Device 1** and **Target Device 2** from DA SILVA SANTOS and were shipped to this district.  **Target Device 1** and **Target Device 2** are currently in the custody of HSI located at 880 Front Street, Suite 3200, San Diego, California 92101.

5.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement.

Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device 1** and **Target Device 2**, it does not contain all the information known by me or other agents regarding this investigation.   All dates and times described are approximate.

## **BACKGROUND**

6.     I have been a Special Agent with Homeland Security Investigations ("HSI") since June 2018.  I am currently assigned to a Financial Task Force in San Diego, California which focuses on money laundering, financial fraud, international transfer of illicit proceeds, and the importation of controlled substances, and corresponding financial transactions along the Southwest Border.

7.     During my career I have participated in numerous money laundering and controlled substance investigations involving: (i) unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of narcotics; (ii) the laundering of narcotics proceeds, and monetary instruments derived from narcotics activities; and (iii) conspiracies associated with money laundering and narcotic offenses.

8.     These investigations have involved debriefing defendants and witnesses, the utilization of cooperating sources, conducting undercover operations, conducting surveillance, executing search warrants, seizing bank accounts, and making arrests for related offenses.

9.     As a Special Agent focusing on financial crimes and money laundering, I have received training in conducting financial investigations. As part of my assignment, I investigate possible money laundering, operations of money transmitting businesses, structuring, and Bank Secrecy Act (31 U.S.C. et seq., the "BSA") violations. More specifically, I regularly investigate violations of 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. 1349 (wire fraud), 18 U.S.C. 1960 (operation of an unlicensed money transmitting business), as well as possible violations of the reporting requirements set forth in the BSA, 31 U.S.C. §§ 5316, 5324, and 5330 (a currency transaction report—

"CTR"; currency and monetary instrument report— "CMIR"; and registration of a money service business— "RMSB").

10.     Before being hired with HSI, I was employed as a Border Patrol Agent, and Supervisory Border Patrol Agent at various locations in San Diego County working human smuggling, human trafficking and narcotics smuggling cases.

11.     Based upon my training, experience, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone.

12.     I submit this affidavit in support of the application to search the Target Devices for, and to seize, as they pertain to violations of 18 U.S.C. §§ 1349, 1343, Wire Fraud, and Conspiracy to Commit Wire Fraud (the "Target Offenses"), all communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a.     tending to indicate efforts to commit the Target Offenses;

    b.     tending to link DA SILVA SANTOS to any of the following person(s) or entities: Ethos Asset Management, Sean Winston, Atlas Capital Management LLC, Hans Kastensmith, Laura Nixon, Attributed Holdings International, Michael Mehalko, Asset Vest, Elias Achilleos, Michael Starvis; Ricardo Trindade;

    c.     tending to identify co-conspirators, criminal associates, or others involved in committing Target Offenses;

    d.     tending to identify travel to or presence at locations involved in the commission of Target Offenses;

    e.     tending to identify the user of, or persons with control over or access to, the **Target Device 1** and **Target Device 2**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

13. On February 6, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a search and seizure of DA SILVA SANTOS's email account from Microsoft Corporation. *See* 23-MJ-409. In summary, the affidavit supporting the 23-MJ-409 warrant explains an advance fee loan scheme involving DA SILVA SANTOS and Hans KASTENSMITH. The affidavit supporting the 23-MJ-409 warrant is attached as Exhibit 1, and incorporated fully herein.

14. On November 10, 2023, the Honorable Barbara L. Major, United States Magistrate Judge, Southern District of California, signed a Complaint and Arrest Warrant charging DA SILVA SANTOS with wire fraud conspiracy in violation of 18 U.S.C. § 1349. *See* 23-MJ-4145. The Complaint and Statement of Probable Cause are attached as Exhibit 2, and incorporated fully herein (the "Santos Complaint").

15. Pursuant to the Santos Complaint and related Arrest Warrant, HSI Special Agents arrested DA SILVA SANTOS on Sunday, November 12, 2023, when he arrived at Newark Liberty International Airport on board a flight from Istanbul, Turkey.

16. **Target Device 1** and **Target Device 2** were found and seized by an HSI Special Agent. **Target Device 1** was found by the HSI Special Agent in the Defendant's blazer pocket, and **Target Device 2** was found inside the Defendant's shoulder bag.

17. Based on my investigation into DA SILVA SANTOS, he uses cell phones and computers to communicate with prospective borrowers and co-conspirators. For example, Co-Conspirator 1 consented to a download of his cell phone which revealed a WhatsApp message thread between Co-Conspirator 1 and DA SILVA SANTOS between May 3, 2021, to September 28, 2023. Similarly, I have reviewed emails sent by DA SILVA SANTOS to his victims, including D.S. and E.S as described in the Santos Complaint.

18. In addition, based upon my experience and training, consultation with other law enforcement officers experienced in financial fraud investigations, and all the facts and

opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device 1** and **Target Device 2**.  In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Device 1** and **Target Device 2** to communicate with others to further the financial fraud conspiracy as described in the Santos Complaint. Accordingly, I request permission to search the **Target Device 1** and **Target Device 2** for data beginning on November 6, 2019, up to and including November 12, 2023.

## MOBILE DEVICE METHODOLOGY

19.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take

weeks or longer.

20.     Following the issuance of this warrant, I will collect the **Target Device 1** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

22.     It is possible that personnel reviewing the data will encounter materials subject to the attorney-client privilege or the attorney work product doctrine.  The examination personnel will therefore take steps to ensure that the attorney-client privilege or the attorney work product doctrine is not violated.  Specifically, the investigative team will only review communications between DA SILVA SANTOS and Co-Conspirators listed in subsection b of Attachment B, who are non-lawyers, until a filter protocol is established or Defendant's counsel completes a filter review.

## COMPUTER METHODOLOGY

**Procedures For Electronically Stored Information as to Target Device 2**

23.     With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding **Target Device 2**, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

a.     After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite.  A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without

changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.  The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

b.     If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure absent further application to this court.

### Identification and Extraction of Relevant Data

c.     After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and

security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

        d.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.   To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.     Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for

relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

h.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

i.   It is possible that personnel reviewing the data will encounter materials subject to the attorney-client privilege or the attorney work product doctrine.  The examination personnel will therefore take steps to ensure that the attorney-client privilege or the attorney work product doctrine is not violated.  Specifically, the investigative team will only review communications between DA SILVA SANTOS and Co-Conspirators listed subsection b of Attachments B, who are non-lawyers, until a filter protocol is established or Defendant's counsel completes a filter review.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

24.   Law enforcement has not previously attempted to obtain the evidence sought by this warrant

## CONCLUSION

25.   Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device 1** and **Target Device 2** will yield evidence of DA SILVA SANTOS' violations of Title 18 U.S.C. §§ 1349, 1343, Wire

Fraud, and Conspiracy to Commit Wire Fraud. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

26. I swear the foregoing is true and correct to the best of my knowledge and belief.

_____

Special Agent Brian Holerud,
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 14th day of November 2023.

_____
Honorable Barbara L. Major
United States Magistrate Judge

## ATTACHMENT A-1

### PROPERTY TO BE SEARCHED

The following property is to be searched:

Silver i-Phone 13 Pro Max
Seizure No. 2024460100030101-0001
**("Target Device 1")**



**Target Device 1** is currently in the possession of Homeland Security Investigations, located at 880 Front Street, Suite 3200, San Diego, California 92101.

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

The following property is to be searched:

Silver Dell Laptop
Seizure No. - 2024460100030101-0002
**("Target Device 2")**



**Target Device 2** is currently in the possession of Homeland Security
Investigations, located at 880 Front Street, Suite 3200, San Diego, California
92101.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 and the laptop described in Attachment A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone or laptop for evidence described below. The seizure and search of the cellular telephone and laptop shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone and the laptop will be electronic records, communications, and data such as emails, email attachments, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of November 6, 2019, up to and including November 12, 2023:

a. tending to indicate efforts to commit Wire Fraud and Conspiracy to Commit Wire Fraud;

b. tending to link DA SILVA SANTOS to any of the following person(s) or entities: Ethos Asset Management, Sean Winston, Atlas Capital Management LLC, Hans Kastensmith, Attributed Holdings International, Michael Mehalko, Asset Vest, Elias Achilleos;

c. tending to identify co-conspirators, criminal associates, or others involved in committing Wire Fraud and Conspiracy to Commit Wire Fraud;

d. tending to identify travel to or presence at locations involved in the commission of Wire Fraud and Conspiracy to Commit Wire Fraud;

e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 18 U.S.C. §§ 1349, 1343, Wire Fraud, Conspiracy to Commit Wire Fraud.

# Exhibit 1
Affidavit in support of the
23-MJ-409 Warrant

**AFFIDAVIT**

I, Kevin Day, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

**INTRODUCTION**

1.   I make this affidavit in support of an application for a search warrant of one Microsoft Corporation email account and one Web.com Group Inc. email account.  The purpose of the search is related to an ongoing financial fraud investigation involving the email accounts.  The e-mail accounts to be searched are:

    (1)    Carlos@ethosasset.com
           ("**Subject Account #1**")

    (2)    HCK@attributedholdings.com
           ("**Subject Account #2**")

(hereafter the "**Subject Accounts**").

2.   Based upon my experience and training, and all the facts and opinions set forth in this affidavit, I submit this affidavit in support of the application to search the account or identifier listed on Attachment A, and to seize, as they pertain to violations of 18 U.S.C. § 371 (conspiracy), § 1343 (wire fraud), § 1344 (bank fraud) (collectively, the "Target Offenses"), the following communication, records, and attachments:

    a.   tending to identify attempts to commit the Target Offenses;

    b.   tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the Target Offenses tending to identify witnesses, co-conspirators, criminal associates, or others involved in the Target Offenses;

    c.   tending to identify travel to or presence at locations involved in the Target Offenses;

    d.   tending to identify the user of, or persons with control over or access to, the subject account(s); or

e. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## **EXPERIENCE AND TRAINING**

3.     I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since February 2016. I am currently assigned to the San Diego Office Costa Pacifico Money Laundering Task Force. I was previously assigned to the San Ysidro Contraband Smuggling Group 1. Prior to my employment with HSI, I was employed as a federal agent with the United States Border Patrol (USBP) since January 2003.  For a portion of my Border Patrol Agent career, I was assigned to the HSI San Diego Human Smuggling/Trafficking Group.

4.     I have completed criminal investigation training at the Federal Law Enforcement Training Center in Glynco, Georgia, including training in how to conduct various types of investigations involving financial fraud, identity fraud, document fraud, wire fraud, mail fraud, and bank fraud, and training in the methods, devices, and practices common to individuals and organizations who commit financial fraud, identity fraud, document fraud, wire fraud and bank fraud, and other financial crimes.  In my role as a Special Agent, I have conducted and participated in numerous investigations of criminal laws, including laws related to financial fraud, identity fraud, document fraud, wire fraud, mail fraud, bank fraud, and financial crimes.  In these investigations, I have conducted searches, seizures, interviews, and arrests.

5.     I have also had also handled multiple investigations involving financial crimes, including money laundering and bulk cash smuggling.  I am familiar with money laundering operations conducted by transcontinental criminal organizations, and methods in which these organizations conceal and use their funds.  During these investigations, I have utilized various methods to investigate financial crimes, such as the use of grand jury subpoenas, analysis of bank accounts and wire transfers, and the use of confidential

informants. Through these investigations, I have investigated multi-million-dollar fraudulent activities and transnational criminal organizations that use the U.S. financial system to help perpetuate their frauds and laundering activities. I have also spoken to other HSI Special Agents and other law enforcement professionals about methods in which individuals and organizations use schemes to defraud individuals of money. I have also investigated identity theft and the use of fraudulent government documents and identifications.

6. Based on my training and experience, I know that individuals committing fraud and financial crimes often require the use of communication facilities in furtherance of their criminal activity. Common communication facilities include emails, cellular phones, and messaging apps. Fraudsters use these facilities to negotiate times, places, schemes, payments, sending, receiving, creating, and possessing fraudulent documents, interactions with individuals that have been defrauded and recruiting individuals to the scheme. I know that professional fraudster operations depend upon maintaining their own extensive contacts. The use of communication facilities enables fraudsters to maintain contact with fraudster associates, transmitting of fraudulent documents, and contact individuals that are being defrauded. I also know that fraudsters sometimes use fraudulent information, such as nominee names and false addresses, to subscribe to communication facilities, and frequently use communication facilities to thwart law enforcement efforts to intercept their communications.

7. The following is based on my own investigation and investigations conducted by other law enforcement agents, including oral and written reports by other law enforcement officers, physical surveillance, interviews, public records, database checks, searches, phone analysis, and other investigation and information. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. Moreover, because the investigation is constantly learning new facets of the below-described fraud scheme, my understanding as to the methods and intricacies of the scheme is constantly evolving as I learn new information about how the targets operate. This

3

affidavit is therefore a summary of my current understanding of the scheme and is subject to change as the investigation uncovers additional information.

## STATUTES AT ISSUE

8.    The Target Offenses are the following: 18 U.S.C. § 371 (conspiracy), § 1343 (wire fraud), and § 1344 (bank fraud).

9.    The elements of conspiracy are (1) an agreement between two or more persons to commit at least one crime, (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it, and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. *See* Ninth Circuit Jury Instruction 11.1 – Conspiracy Elements.

10.    The elements of wire fraud are (1) the defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made as part of the scheme were material; (3) the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and (4) defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.  *See* Ninth Circuit Jury Instruction 15.35 – Wire Fraud.

11.    The elements of bank fraud are (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution as to something of value, (2) the defendant did so with the intent to defraud the financial institution, and (3) the financial institution was insured by the Federal Deposit Insurance Corporation. *See* Ninth Circuit Jury Instruction 15.36 – Bank Fraud.

## FACTS SUPPORTING PROBABLE CAUSE

### I.    Background

12.    Since December 2020, HSI has been investigating Carlos Manuel Da SILVA SANTOS ("DA SILVA SANTOS"), Ethos Asset Management LLC and Ethos Asset Management, Inc. (collectively "ETHOS"), and Hans KASTENSMITH

1 ("KASTENSMITH") for conspiracy, wire fraud, and bank fraud, all in furtherance of an

2 international Ponzi scheme.

3       13.    Both ETHOS entities are incorporated in California. Ethos Asset

4 Management LLC is headquartered at 4954 Del Monte Avenue, San Diego, CA 92107.

5 Ethos Asset Management, Inc. is headquartered at 4660 La Jolla Village Drive, San Diego,

6 CA 92122.

7       14.    DA SILVA SANTOS is the Chief Executive Officer of ETHOS.

8 KASTENSMITH is the Executive Director of ETHOS for North and Central America.

9 KASTENSMITH's primary role is to promote ETHOS and recruit potential target

10 businesses as part of the below-discussed Ponzi scheme.

11       15.    On August 22, 2022, a Source of Information 1 (hereinafter "SOI 1") provided

12 information to your affiant that since 2018 SOI 1 had been in a romantic relationship with

13 DA SILVA SANTOS, in 2019 had helped him establish Ethos Asset Management LLC,

14 the first iteration of ETHOS in the United States, and had been an employee there. In 2021,

15 SOI 1 ended SOI 1's personal and professional relationship with DA SILVA SANTOS and

16 ETHOS after learning that DA SILVA SANTOS had falsified financial transactions and

17 bank statements using ETHOS email addresses and bank records.

18       16.    On September 18, 2022, Source of Information 2 (hereinafter "SOI 2")

19 provided information that since 2019 SOI 2 had a professional business partnership with

20 DA SILVA SANTOS and later consulted for ETHOS. In 2021 SOI 2 ended SOI 2's

21 professional relationship with DA SILVA SANTOS and ETHOS upon learning that DA

22 SILVA SANTOS falsified financial transactions and bank statements using ETHOS email

23 addresses and bank records.

24       17.    SOI 2 explained that KASTENSMITH operates as a promoter of ETHOS and

25 recruiter of target businesses who are seeking loans.

26       18.    Subsequent investigation revealed the general scheme performed by DA

27 SILVA SANTOS and KASTENSMITH through ETHOS to fraudulently obtain money

28 from victims. Evidence shows that DA SILVA SANTOS and KASTENSMITH execute a

fraudulent "pay-to-play" loan scheme by holding ETHOS out as a loan originator or investment vehicle to businesses around the world in need of financing. In return for a loan with favorable terms, DA SILVA SANTOS and KASTENSMITH require a target business to provide a percentage of the total loan amount as a "pledge" or collateral in the form of cash deposited into an ETHOS controlled bank account. Once a target business provides the collateral, the loan agreement's terms generally require ETHOS to provide the loan in tranches over a specified period.

19. To convince target businesses to provide the substantial collateral deposit, DA SILVA SANTOS and KASTENSMITH send emails to target businesses with documents purporting to demonstrate ETHOS' success, vast wealth, and access to capital around the world. These documents consist of forged or altered bank statements and fraudulent letters purporting to grant ETHOS access to certain capital markets that other investment companies lack.

20. Once a targeted business enters into a loan agreement with ETHOS and deposits the collateral, ETHOS fails to provide the loan payments. Instead, DA SILVA SANTOS or KASTENSMITH send additional emails containing fraudulent documents. For instance, these emails contain altered bank statements fraudulently showing millions of dollars ready for transfer to the target business, but in truth, the accounts contain little money on deposit and nowhere near the amount claimed on the fraudulent bank statements. In some cases, ETHOS pays the target businesses back an amount equal to the deposited collateral, fails to disburse the loan on schedule, or does not provide the loan.

21. SOI 1 has indicated that DA SILVA SANTOS uses the collateral cash deposits to enrich himself and to payback target businesses in the amount equal to their collateral deposit.

22. I have interviewed individuals and representatives of businesses who consider themselves victims of DA SILVA SANTOS's and KASTENSMITH's scheme. Based on these interviews and other information gathered to date, DA SILVA SANTOS and

KASTENSMITH continue to use ETHOS to procure money from unsuspecting target businesses as part of an overall Ponzi scheme.

23. For example, on January 24, 2023, I spoke with a Source of Information 3 (hereinafter "SOI 3") employed by a wealth management firm in the United Kingdom. On or about July 2022, SOI 3 represented Company 1 in a transaction with ETHOS. SOI 3 explained that Company 1 opened an account at a brokerage firm to deposit $1 million as collateral to obtain a $4 million loan from ETHOS. DA SILVA SANTOS withdrew $650,000 from the brokerage account, but never provided Company 1 with a loan. Instead, DA SILVA SANTOS used **Subject Account #1** to deceive Company 1 regarding loan disbursements. In January 2023, ETHOS paid Company 1 $650,000.

## II. Specific Instance of Fraud – April 2021 Emails

24. Through consulting work for ETHOS, SOI 2 was involved in a business transaction between ETHOS and Idaho Health Data Exchange Inc. ("Idaho Health"). ETHOS agreed to provide Idaho Health a loan in the amount of $8 million in exchange for Idaho Health depositing $2 million into a collateral account. ETHOS withdrew $1.5 million from the collateral account, but failed to disburse the loan on schedule. While ETHOS eventually provided the loan to Idaho Health, DA SILVA SANTOS used **Subject Account #1** to deceive representatives from Idaho Health using forged bank statements.

25. SOI 1 provided an April 19, 2021 wire transfer receipt for $6,626.35 from an ETHOS account at Wells Fargo ending in -9784 with confirmation number OW0001319318627. SOI 1 also provided an email dated April 22, 2021, in which DA SILVA SANTOS used **Subject Account #1** to send an altered wire transfer receipt for $1,200,000.00 to representatives of Idaho Health. The altered wire transfer receipt sent by **Subject Account #1** shows money being wired to D. L. Evans Bank for Idaho Health account ending in -4841 from an ETHOS account at Wells Fargo ending in -9784 with confirmation number OW0001319318627. The fraudulent wire served to deceive Idaho Health regarding a disbursement of funds owed by ETHOS.

26.     The image below is a true and accurate copy with added red circles for emphasis of relevant information of the altered wire transfer receipt sent by **Subject Account #1**.



27.     The image below is a true and accurate copy with added red circles for emphasis of relevant information of the actual wire transfer receipt for ETHOS's account at Wells Fargo ending in -9784 on April 19, 2022 with confirmation number OW0001319318627.

**Your Wire Transfer is being processed**

You recently submitted the following transfer:

**Transfer details**

| | |
|---|---|
| To account | XXXXXXXXXXXXXXXXXXXXX3564 |
| From account | XXXXX9784 |
| Amount | $6,626.35 |
| Send on | 04/19/2021 |
| Confirmation number | OW00001319318627 |

If you did not submit this transfer, or if you have questions, please call Wells Fargo Online Customer Service at 1-800-956-4442. We are available 24 hours a day, 7 days a week

wellsfargo.com | Security Center

Please do not reply to this automated email. Sign on to send a secure email.

f6d49cde-6ef7-4aaf-917c-f3448b233b0e

28.     Official financial records received from Wells Fargo pursuant to a grand jury subpoena corroborate DA SILVA SANTOS's use of **Subject Account #1** to send fraudulent bank statements.  Specifically, an official account statement dated April 30, 2021 for ETHOS's account at Wells Fargo ending in -9784 show that wire confirmation number OW0001319318627 references a wire of $6,626.35 sent on April 19, 2021.  The same official account statement has no outgoing wire in the amount of $1,200,000 at any time for the month of April 2021.  The records also show the account's available balance on April 19, 2021 was $140,381.92.

**III.     Specific Instance of Fraud –  August 2021 Emails**

29.     In 2021 KASTENSMITH introduced ETHOS to DxSelect LLC, an entity headquartered in Rochester, NY.  DxSelect LLC and ETHOS agreed to a $4 million loan for which DxSelect LLC would provide $1.02 million as collateral into a bank account.  ETHOS withdrew $650,000 from the collateral account and never provided a loan.

30.     A representative of DxSelect LLC provided an August 8, 2021 email from **Subject  Account  #1**.  That mail contained  a  purported  bank  statement  for  ETHOS'

9

1   Citibank account ending in -1032 printed on July 24, 2021 showing a balance of
2   $100,304,447.76 for the purpose of verification of funds to supply a loan to DxSelect LLC.

3       31.     The image below is a true and accurate copy with an added red circle for
4   emphasis of relevant information of the altered bank statement for ETHOS's Citibank
5   account ending in -1032 sent by **Subject Account #1** to representatives from DxSelect
6   LLC.



16      32.     The official record below, which I received from Citibank pursuant to a grand
17  jury subpoena, confirms that the bank statement sent by **Subject Account #1** to DxSelect
18  LLC was fraudulent.   Specifically, the official bank statement for ETHOS's account at
19  Citibank ending in -1032 confirms that the account never had a balance of $100,304,447.76
20  during the relevant period.

21      33.     The image below is a true and accurate copy of the actual bank statement for
22  ETHOS' Citibank account ending in -1032 for period July 23 – August 20, 2021.

| CitiBusiness Streamlined Checking | | | | |
|---|---|---|---|---|
| 6780641032 | | Beginning Balance: | | $356,058.00 |
| | | Ending Balance: | | $294,841.20 |
| Date | Description | Debits | Credits | Balance |
| 07/23 | FUNDS TRANSFER<br>WIRE FROM ATLAS CAPITAL MA NAGEMENT LLC   Jul 23 | | 550,000.00 | 906,058.00 |
| 07/23 | DEBIT CARD PURCH Card Ending in 6295<br>R0DFHN16          006295 Jul 23<br>#57 OCEAN PRIME DC   WASHINGTON   DC 21203 | 200.00 | | 905,858.00 |
| 07/26 | DEBIT CARD (POS) Card Ending in 6295<br>ATT W133 6607      WASHINGTON   DCUS0514 | 95.39 | | 905,762.61 |
| 07/26 | OFF-US ATM WITHDRAWAL<br>ST. REGIS WA-CFN3161   WASHINGTON   DCUS051 | 203.95 | | 905,558.66 |
| 07/26 | DEBIT CARD PURCH Card Ending in 6295<br>KZVKBWOH          006295 Jul 26<br>TST* GEORGIA BROWN S WASHINGTON   DC 21204 | 742.50 | | 904,816.16 |
| 07/26 | INCOMING WIRE TRAN FEE<br>INCOMING WIRE    FEE      F011204080E501 Jul 26 | 15.00 | | 904,801.16 |
| 07/27 | DEBIT CARD PURCH Card Ending in 6295<br>CFJ00CR3          006295 Jul 27<br>DNH*GO DADDY EUROPE G 020 7979 2661 GBR21207 | 99.06 | | 904,702.10 |

## IV.   Specific Instance of Fraud – November 2021 Emails

34.     On November 8, 2021, representatives from DxSelect LLC emailed **Subject Account #1** regarding a check in the amount of $600,000.00 from ETHOS's Comerica Bank account that bounced for insufficient funds. **Subject Account #1** wrote to representatives from DxSelect LLC and **Subject Account #2** that the ETHOS account at Comerica Bank had an available balance of $23,000,000.00.

35.    The below image is a true and accurate copy  with added yellow highlighting for emphasis of relevant information of the email sent by **Subject Account #1** to representatives from DxSelect LLC claiming to have $23,000,000.00.

From: Carlos Santos <carlos@ethosasset.com>
Sent: Monday, November 8, 2021 1:48:33 PM
To: John Haughton <jhaughton@dxselect.com>; Betsy Gaffney <bgaffney@dxselect.com>; Hans C. Kastensmith <hck@attributedholdings.com>
Subject: Re: reason = insufficient funds... RE: The check bounced at the bank

Hi Betsy and John,

I hope that you are well.

Sorry for the situation. We don't know what it is happening. We did four checks and looks that all of them are having the same problem. We have a balance of 23 Million US$ in this new account and we don't understand.

Your email was forward to Comerica and I'm trying to have an answer URGENTLY!

Sorry for the delay to return, but I arrived this morning and I'm in meetings all day… But I will guarantee call you today.

BE ASSURE THAT WE HAVE THE FUNDS TO PROVIDE YOU.

Let me only have an position from the bank.

Kind regards,
Carlos Santos


Obter o Outlook para iOS

From: John Haughton <jhaughton@dxselect.com>
Sent: Monday, November 8, 2021 10:26:41 PM
To: Betsy Gaffney <bgaffney@dxselect.com>; Carlos Santos <carlos@ethosasset.com>; Hans C. Kastensmith <hck@attributedholdings.com>
Subject: reason = insufficient funds... RE: The check bounced at the bank

Carlos & Hans,

Update from the bank… Bounce reason = insufficient funds.

What are the next steps and what actions should be taken at this time.

John

36.     Official financial records received from Comerica Bank pursuant to a grand jury subpoena show that ETHOS had two accounts at Comerica Bank.  Neither account ever had a balance of $23,000,000.  Rather, ETHOS's Comerica Bank account ending in -8324 shows a starting balance of $2,000.00 and ending balance of $1,872.00 during the relevant time period.  Similarly, ETHOS's Comerica Bank account ending -8316 shows a starting balance of $1,928.00 and ending balance of $1,706.00 during the relevant time period.  The accounts never had funds to cover the $600,000.00 check sent to DxSelect LLC.

37.     The images below are true and accurate copies with added yellow highlighting for emphasis of relevant information of the actual bank statements for ETHOS's accounts at Comerica Bank ending in -8324 and ending in -8316 in November 2021.

**1**
**2**

ETHOS ASSET MANAGEMENT INC
4660 LA JOLLA VILLAGE DRIVE
SAN DIEGO CA 92122

**3**
**4**

***Small Business Checking***
**statement**

**5**

November 1, 2021 to November 30, 2021
Account number 1895658324

**6**
**7**

## Account summary

**To contact us**

**8**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**9**

| **Beginning balance** on November 1, 2021 | **$2,000.00** |
|---|---|

**Write to us**
COMERICA BANK
13920 CITY CENTER DR STE 4000
CHINO HILLS CA 91709-4564

**10**

| Less withdrawals | |
| Fees and service charges | -$128.00 |

**11**
**12**

| **Ending balance** on November 30, 2021 | **$1,872.00** |
|---|---|

**13**
**14**

80564

**15**

ETHOS ASSET MANAGEMENT INC
4660 LA JOLLA VILLAGE DRIVE
SAN DIEGO CA 92122

**16**
**17**

***Small Business Checking***
**statement**

**18**

November 1, 2021 to November 30, 2021
Account number 1895658316

**19**
**20**
**21**

## Account summary

**To contact us**

**Call**
(800) 522-2265
**Visit our web site**
www.comerica.com

**22**

| **Beginning balance** on November 1, 2021 | **$1,928.00** |
|---|---|

**23**

**Write to us**
COMERICA BANK
13920 CITY CENTER DR STE 4000
CHINO HILLS CA 91709-4564

**24**

| Less withdrawals | |
| Fees and service charges | -$222.00 |

**25**

| **Ending balance** on November 30, 2021 | **$1,706.00** |
|---|---|

**26**
**27**
**28**

### V.    Specific Instance of Fraud – December 2021 Emails

38.    In 2021 KASTENSMITH introduced ETHOS to ENTvantage Diagnostics Inc., an entity headquartered in Austin, TX.  ENTvantage Diagnostics Inc., and ETHOS agreed to a $4 million loan for which ENTvantage Diagnostics Inc. would provide $1 million as collateral into a bank account.  ETHOS withdrew $650,000 from the collateral account and never provided a loan.

39.    Representatives of ENTvantage Diagnostics Inc. provided a December 14, 2021 email in which **Subject Account #1** forwarded to ENTvantage Diagnostics Inc. a purported money transfer instruction from ETHOS to Citibank N.A. allegedly directing the transfer of $820,000.00 to ENTvantage Diagnostics Inc. from ETHOS' Citibank N.A. account ending in -1032.

40.    The below image is a true and accurate copy of the purported wire transfer instruction sent by **Subject Account #1** to representatives from ENTvantage Diagnostics Inc. regarding the funding of a loan.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ETHOS ASSET
MANAGEMENT

December 14th, 2021

Page | 1

To: CITIBANK N.A.

Please make the following transfer from Ethos Assets Management Inc. USD Account nr. 6780641032 to the recipient below:

RECEIVER BANK: JP Morgan Chase Bank, NA
BANK ADDRESS: 9739 Great Hills Trail, Austin TX. 78759
ACCOUNT NAME: Entvantage Diagnostics, Inc. d/b/a ENTvantage DX
ACCOUNT NUMBER: 207788321
SWIFT CODE CHASUS33
IBAN/ IU: 111006614
Amount: US$ 820,000

Correspondent bank charges belong to Ethos Asset Management., Inc.

For and on behalf of Ethos Asset Management Inc.

Signature:

Name / Title: Member and Director – CARLOS MANUEL DA SILVA SANTOS
Company: Ethos Asset Management Inc.
Passport Number: C659354
Date of Issue: December 20, 2017
Date of Expiry: December 20, 2022
Country of Issuance: Portugal

Ethos Asset Management INC
4660 La Jolla Village Drive, San Diego, California, 92122, United States of America
+1 (202) 374-5023 | +351 913 855 564 | carlos@ethosasset.com

Confidential

41.    Official financial records received from Citibank N.A. pursuant to a grand jury subpoena confirm that ETHOS and DA SILVA SANTOS never sent the purported wire instruction to the bank.  In addition, there were no transactions on or about December 14, 2021 for ETHOS's account and no wire transaction for $820,000.00.  There were insufficient funds both before and after the fraudulent wire transfer instruction was created and/or sent to ENTvantage Diagnostics Inc. on December 14, 2021.

42.    The image below is a true and accurate copy  with added yellow highlighting for emphasis of relevant information of the actual bank statement for ETHOS's accounts at Citibank N.A. ending in -1032.

ETHOS ASSET MANAGEMENT, INC.  Account  6780641032  Page 3 of 4
001/R1/04F000

Statement Period: Nov 23 - Dec 21, 2021

**CHECKING ACTIVITY**  Continued

| Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/07 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 631,487.67 |
| 12/07 | CBUSOL TRANSFER DEBIT<br>WIRE TO William Watson Group, LLC | 5,000.00 | | 626,487.67 |
| 12/07 | CBUSOL TRANSFER DEBIT<br>WIRE TO THUNDER VALLEY COMMUNITY DEVELOPME | 50,000.00 | | 576,487.67 |
| 12/07 | CBUSOL TRANSFER DEBIT<br>WIRE TO DxSelect, LLC | 50,000.00 | | 526,487.67 |
| 12/07 | ACH DEBIT<br>AMERICAN EXPR  ACH PMT  M5368    Dec 07 | 17,000.00 | | 509,487.67 |
| 12/08 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 509,470.67 |
| 12/08 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 509,453.67 |
| 12/08 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 509,436.67 |
| 12/08 | CBUSOL TRANSFER DEBIT<br>WIRE TO ANTOINETTE R WOODS | 10,000.00 | | 499,436.67 |
| 12/08 | CBUSOL TRANSFER DEBIT<br>WIRE TO Entvantage Diagnostics, Inc. | 50,000.00 | | 449,436.67 |
| 12/08 | CBUSOL TRANSFER DEBIT<br>WIRE TO Idaho Health Data Exchange | 50,000.00 | | 399,436.67 |
| 12/09 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 399,419.67 |
| 12/09 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 399,402.67 |
| 12/09 | CBUSOL TRANSFER DEBIT<br>WIRE TO Entvantage Diagnostics, Inc. | 50,000.00 | | 349,402.67 |
| 12/09 | CBUSOL TRANSFER DEBIT<br>WIRE TO THUNDER VALLEY COMMUNITY DEVELOPME | 50,000.00 | | 299,402.67 |
| 12/10 | CBUSOL INTERNATIONAL WIRE OUT | 5,200.30 | | 294,202.37 |
| 12/10 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 294,185.37 |
| 12/10 | SERVICE CHARGES<br>FEE FOR DOMESTIC FUNDS TRANSFER | 17.00 | | 294,168.37 |
| 12/10 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 294,141.37 |
| 12/10 | CBUSOL TRANSFER DEBIT<br>WIRE TO DxSelect, LLC | 50,000.00 | | 244,141.37 |
| 12/10 | CBUSOL TRANSFER DEBIT<br>WIRE TO Idaho Health Data Exchange | 50,000.00 | | 194,141.37 |
| 12/15 | TRANSFER DEBIT<br>TRANSFER TO CHECKING     Dec 15<br>VIA CBUSOL        REFERENCE # 006646 | 10,000.00 | | 184,141.37 |
| 12/16 | CBUSOL INTERNATIONAL WIRE OUT | 1,500.00 | | 182,641.37 |
| 12/16 | CBUSOL INTERNATIONAL WIRE OUT | 2,000.00 | | 180,641.37 |
| 12/16 | CBUSOL INTERNATIONAL WIRE OUT | 9,000.00 | | 171,641.37 |
| 12/16 | CBUSOL INTERNATIONAL WIRE OUT | 10,182.75 | | 161,458.62 |
| 12/16 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 161,431.62 |
| 12/16 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 161,404.62 |
| 12/16 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 161,377.62 |
| 12/16 | SERVICE CHARGES<br>FEE FOR INTERNATIONAL FUNDS TRANSFER | 27.00 | | 161,350.62 |
| | **Total Debits/Credits** | **1,756,374.32** | **1,777,897.14** | |

Interest earned year to date  $1,500.00

## VI.  Specific Instance of Fraud — March 2021 Emails

43.  On March 29, 2021, **Subject Account #2** sent an email to representatives of ENTvantage Diagnostics Inc.  titled: "Wells Fargo POF" [Proof of Funds].  The body of the email stated: "Does this help? They [ETHOS] have shared their bank account." The email had an attachment which was a fraudulent Wells Fargo Bank account statement for ETHOS' account ending in -9784.

16

44.     The image below is a true and accurate copy with added yellow highlighting for emphasis of relevant information of the fraudulent bank statement sent by **Subject Account #2** to representatives of ENTvantage Diagnostics Inc.



45.     The image below is a true and accurate copy with added yellow highlighting for emphasis of relevant information of the actual bank statement for ETHOS's accounts at Wells Fargo Bank ending in -9784.



46.     Official financial records received from Wells Fargo pursuant to a grand jury subpoena corroborate KASTENSMITH's use of **Subject Account #2** to send fraudulent bank statements.  Official bank records show the account balance of ETHO's account ending in -9784 was $25,900.10 and not $495,849,607.23 as KASTENSMITH claimed. The fraudulent statement had a statement date of March 25, 2021 and official bank records have the statement date as March 31, 2021.

## VII.   Specific Instance of Fraud – February 2022 Emails

47.     BTG Pactual US Capital LLC. (BTG) is a bank where ETHOS has several accounts, one of which is an investment account.  BTG became aware that DA SILVA SANTOS and ETHOS were misrepresenting BTG as an involved party in agreements

being drafted for potential clients. These agreements require a target business to "pledge" or deposit collateral in ETHOS's account as part of the scheme described above.

48.     BTG obtained four of these agreements between DA SILVA SANTOS, ETHOS and potential clients, and pursuant to a grand jury subpoena provided copies of those agreements to law enforcement.  BTG drafted Cease and Desist letters to DA SILVA SANTOS and ETHOS for representing the bank as a "Collateral Agent" to these agreements without BTG's knowledge.

49.     The image below is a true and accurate copy  with added yellow highlighting for emphasis of relevant information of a September 3, 2021 agreement between ETHOS and Anamaya US LLC in which DA SILVA SANTOS misrepresents BTG's status as a party to the agreement

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

**FORM OF INSTRUCTION**

**VIA EMAIL:**

Pledgor:
**ANAMAYA US, LLC.**
Mr. MICHAEL I BLONSKY
MANAGING MEMBER
3004 Astoria Pines Circle, Las Vegas, NV, USA, 89107
michael@anamayaus.com

Secured Party:
**ETHOS ASSET MANAGEMENT INC.**
4660 La Jolla Village Drive, San Diego, California, 92122, USA
Attention: Mr. CARLOS MANUEL DA SILVA SANTOS
CEO
carlos@ethosasset.com

Pursuant to the Pledge, Assignment and Control Agreement dated as of September 3rd, 2021, among **ANAMAYA US, LLC.** (the "Pledgor"), **ETHOS ASSET MANAGEMENT INC** (the "Secured Party"), and BTG PACTUAL US CAPITAL, LLC USA (the "Collateral Agent"), we hereby instruct you of the following:

The Secured Party hereby notifies you that from and after the receipt of this notice until you receive further instruction from the Secured Party, you are hereby directed to retain and hold all funds in the Account (as defined in the Pledge, Assignment and Control Agreement referred to above) and not to invest or disburse the same to any party whatsoever, other than as instructed by the Secured Party.

**ETHOS ASSET MANAGEMENT INC.**
as Secured Party
By: _____
Name: _____
Title: _____

50.     On February 17, 2022, BTG sent an email to **Subject Account #1** containing the Cease and Desist letter to DA SILVA SANTOS and ETHOS directing them to stop misrepresenting the bank as a "Collateral Agent.

51.     The below image is a true and accurate with added yellow highlighting for emphasis of relevant information copy of the Cease and Desist letter that BTG sent to ETHOS and **Subject Account #1** regarding the Anamaya US LLC. agreement.

19



February 17, 2022

**VIA E-MAIL** (carlos@ethosasset.com) **AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**
Ethos Asset Management Inc.
Attn: Carlos Manuel Da Silva Santos
4660 La Jolla Village Drive
San Diego, CA 92122

**VIA E-MAIL** (michael@anamayaus.com) **AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**
Anamaya US, LLC
Attn: Michael I. Blonsky
3004 Astoria Pines Circle
Las Vegas, NV 89107

Re:   Pledge, Assignment, and Control Agreement By and Between Anamaya US,
      LLC and Ethos Asset Management Inc.

It has come to BTG Pactual US Capital, LLC ("BTG") attention that Ethos Asset
Management Inc. entered into select agreements with Anamaya US, LLC, specifically a Pledge,
Assignment, and Control Agreement ("Pledge Agreement" or "the Agreement"), purporting to
name BTG as a party to the Agreement. The Pledge Agreement indicates that BTG serves as the
Collateral Agent and purports to make representations and warranties on behalf of BTG,
indicating that BTG has established and will maintain an account on behalf of the parties.

This notice is to advise you that BTG is not a signatory, party, representative, or
agent in any capacity to any of the above-referenced Agreement. Nor did BTG assume any
duties or obligations under the Agreement, including, without limitation, those related to
underwriting or serving as a collateral agent. BTG has not, and does not, agree to serve in any of
these capacities.

Immediately discontinue all reference and inclusion of BTG in this Agreement and any
transactions related to this Agreement, including, without limitation, removing its name from all
contracts, schedules, exhibits, promotional materials, and any other documents or
communications related to the Agreement.

BTG shall not be responsible or liable for any claims, losses, damages, liabilities, actions,
or any other proceedings commenced or threatened regarding this Agreement or expenses that
arise or result from or are in any way related to this Agreement.

Sincerely,

BTG Pactual US Capital LLC

52.    Official financial records received from BTG corroborate DA SILVA
SANTOS's use of **Subject Account #1** to receive notices of fraudulent conduct related to
the account. Specifically, official bank Cease and Desist letters for fraudulently
misrepresenting BTG as a party in ETHOS agreements with potential clients.

## GENUINE RISKS OF DESTRUCTION OF EVIDENCE

53.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, electronically-stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, if the subject receives advance warning of the execution of this warrant, there will be a genuine risk of the destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

54.     The United States has not attempted to obtain this data by means other than as described in this Affidavit.  However, on February 2, 2023, the United States obtained an order under 18 U.S.C. 2703(d) for subscriber data from the **Subject Accounts**.  *See* 23-MC-225, 23-MC-226.

## MICROSOFT CORPORATION

55.     Microsoft is a multi-national technology company offering a wide array of services to individual and business customers, including email (e.g., Hotmail, Outlook), messaging and VOIP (e.g., Skype), software programs (Office 365 suite), cloud-based personal and business storage and operational solutions (OneDrive, Azure), personal devices (laptops, Surface tablets), gaming devices (Xbox), and developer apps and services (Github). Microsoft Corporation is based in Redmond, Washington.

## WEB.COM GROUP INC.

56.     Web.com Group Inc.is a multi-national technology company offering a wide array of services to individual and business customers, to include electronic mail, otherwise known as e-mail, accounts controlled by the domain registrar and E-mail host known as Network Solutions LLC.  Web.com Group Inc. is based in Jacksonville, Florida.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

57.     As detailed in Attachment B, the evidence sought in this warrant are items from that constitute evidence of violations of Title 18, United States Code, Sections 371, 1343, and 1344

58.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Microsoft and Web.com Group Inc. are not.   It would be inappropriate and impractical for federal agents to search the vast computer network of Microsoft and Web.com Group Inc. for the relevant accounts and then to analyze the contents of those accounts on the premises of Microsoft and Web.com Group Inc. The impact on the Microsoft and Web.com Group Inc. business would be disruptive and severe.

59.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Microsoft Web.com Group Inc. accounts, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Microsoft and Web.com Group Inc., to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the HSI seeks authorization to allow Microsoft and Web.com Group Inc. to make a digital copy of the entire contents of the account(s) subject to seizure.  That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.   Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

60.     Analyzing the data to be provided by Microsoft and Web.com Group Inc. may require special technical skills, equipment, and software.  It may also be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the

data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

61.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.   Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B.  The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

62.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

63.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

64.    It is possible that personnel reviewing the data will encounter materials subject to the attorney-client privilege or the attorney work product doctrine. The examination personnel will therefore take steps to ensure that the attorney-client privilege or the attorney work product doctrine is not violated. Specifically, upon receipt of the data from the service provider, personnel not assigned to the investigation will review the data using methods (including keyword searches) calculated to identify communications to or from attorneys identified by the investigation team. Those materials will be segregated. They will either be excluded entirely from the materials seized pursuant to the warrant, or reviewed separately in a manner that will ensure that no privileged materials are shared with the investigative/prosecution team.

**REQUEST FOR SEALING AND NON-DISCLOSURE ORDERS**

65.    This is an ongoing investigation of which the targets are unaware. There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence, cause targets to flee from prosecution, and seriously jeopardize the success of the investigation by causing targets to change methods and utilize different accounts. Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court.

66.    For the same reasons, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant, until **August 6 , 2023**, absent further order of the court.

**CONCLUSION**

67.    Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of the Target Offenses. The Subject Accounts were likely used to facilitate the

24

offense by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of the Target Offenses.

68.  I also believe that probable cause exists to believe that evidence of illegal activity committed by targets of this investigation continues to exist on the Subject Accounts.

69.  Based upon my experience and training, consultation with other agents in fraud investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth above in Paragraph 2 are likely to be found in the property to be searched described above in Attachment A. Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with HSI, or another law enforcement employee specially trained in digital evidence recovery, to search the items described in Attachments A and seize the items listed in Attachment B.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Kevin Day
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on February 6, 2023.

_____
The Honorable Michael S. Berg
United States Magistrate Judge

25

# Exhibit 2
# Santos Complaint

# SEALED

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>CARLOS MANUEL DA SILVA SANTOS,<br><br>        Defendant. | Case No.  **23mj4145-BLM**<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C., Sec. 1349 – wire fraud conspiracy and attempt to commit wire fraud |

The undersigned complainant being duly sworn states:

Beginning on a date unknown to the complainant and continuing to present, in the Southern District of California and elsewhere, Defendant CARLOS MANUEL DA SILVA SANTOS and others known and unknown to the complainant, knowingly conspired and agreed with each other, to commit the offense of wire fraud, that is, defendant, pursuant to Title 18, United States Code, Section 1343, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of a false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute such scheme and artifice, transmitted and caused to be transmitted in interstate and foreign commerce certain wire communications all in violation of 18 U.S.C. § 1349.

The complainant states that this complaint is based on the attached Statement of Probable Cause incorporated herein by reference.

Kevin Day
Special Agent, Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 10th day of November 2023.

HON. BARBARA L. MAJOR
U.S. MAGISTRATE JUDGE

## STATEMENT OF PROBABLE CAUSE

I, Special Agent Kevin Day, declare under penalty of perjury, the following is true and correct.

CARLOS MANUEL DA SILVA SANTOS ("SANTOS") is the founder, president, and chief executive officer of Ethos Asset Management, Inc., ("Ethos") a California corporation with a principal place of business located at 4660 La Jolla Village Drive, San Diego, California. SANTOS is a citizen of Portugal residing in Turkey. On November 6, 2019, SANTOS opened a bank account with account number ending in x9784 at Wells Fargo Bank, N.A. at one of the bank's branches in San Diego, California.

Co-Conspirator 1 is a United States citizen living in California and is the chairman and chief executive officer of Co-Conspirator Company 1.[1] U.S. Financial Institution 1 is insured by the Federal Deposit Insurance Corporation and is headquartered in California. E.S. is a limited liability company doing headquartered in Maryland. D.S. was a limited liability company incorporated in Wyoming and doing business in New York.

I am the lead case agent of a multi-year investigation into SANTOS, Ethos, and others. As part of the investigation, I have interviewed Co-Conspirator 1 and representatives from E.S., D.S., and others related to their dealings with SANTOS and Ethos. I have reviewed official financial statements obtained from federal grand jury subpoenas and mutual legal assistance treaty requests submitted to foreign countries. I have also reviewed thousands of emails sent by SANTOS and obtained from either SANTOS's victims or the lawful execution of search warrants on various email addresses.

SANTOS holds Ethos out to the public as an entity offering loans to companies. Ethos's website, www.ethosasset.com, describes Ethos as a "Full-service Project Financing" company. To obtain a loan from Ethos, SANTOS requires a prospective borrower to deposit an upfront fee, often referred to as a "pledge," in an amount equal to

---

[1] Co-Conspirator 1 has signed a plea agreement pleading guilty to wire fraud for conduct associated with unlawfully obtaining over $875,000 in funds from COVID-19 pandemic era relief programs in exchange for his testimony about CARLOS MANUEL DA SILVA SANTOS and for not being charged with conduct outlined in this statement of probable cause.

a certain percentage of the overall loan amount.  In many instances, SANTOS requires the prospective borrower to deposit the upfront fee into a securities account owned by the prospective borrower.  Once deposited, the prospective borrower invests the upfront fee in an agreed upon portfolio of securities and SANTOS causes the prospective borrower to obtain a margin on the investment and wire the cash margin to an Ethos controlled bank account.  However, once a borrower pays the upfront fee, SANTOS does not make loan disbursements as agreed upon by the parties.  Instead, financial tracing shows that SANTOS uses the upfront fees to pay back other borrowers, pay co-conspirators, pay himself, and pay for personal expenses.

To facilitate the scheme, SANTOS enlisted Co-Conspirator 1 to vouch for him and Ethos to prospective borrowers even though Co-Conspirator 1 and Co-Conspirator Company 1 had never financed a project with SANTOS or Ethos.  On April 12, 2021, SANTOS emailed Co-Conspirator 1 directing him what to tell prospective borrowers. On or about April 22, 2021 and at the direction of SANTOS, Co-Conspirator 1 participated in a recorded video conference in which he told prospective borrowers that he had financed a "billion" dollars' worth of projects with SANTOS and Ethos.  Based on interviews with Co-Conspirator 1 and a review of Co-Conspirator Company 1's financial records, Co-Conspirator 1 and Co-Conspirator Company 1 have never financed a project with SANTOS or Ethos.

In 2021, D.S. sought funding from Ethos.  In July 2021, SANTOS and D.S. entered into an agreement to loan D.S. $4 million in exchange for a $1 million upfront fee.  To lure D.S. into transmitting the upfront fee, on August 9, 2021, SANTOS sent an email to D.S. representatives on which he attached a July 24, 2021 bank account statement for Ethos's account at Citibank N.A. ending in x1032.  Below is a true and accurate copy of the statement SANTOS emailed:

# ETHOS ASSET
M A N A G E M E N T

PROOF OF ASSET

7/24/2021                                      Account Information - Citibank

citi                                           Printed on: 2021-07-24 08:26:23

## Account Details

Business Checking-1032

**Available Now**          **On Deposit**
$100,304,447.76            $100,304,447.76

This activity occurred after the close of the last business day.

Ethos Asset Management INC
4660 La Jolla Village Drive, San Diego, California, 92122, United States of America
001 (202) 374-5023 | 00351 913 855 564 | carlos@ethosasset.com

The bank account statement purporting to show that Ethos had $100,304,447.76 deposited in its x1032 account at Citibank is fake. Official bank records obtained from Citibank show that account x1032 never had $100,304,447.76 at any time during the account's existence and on July 24, 2021, had a balance of $905,858.00. D.S. provided the $1 million upfront fee to Ethos, but SANTOS never disbursed the loans as promised.

In 2023, E.S. sought funding from Ethos. To lure E.S. into entering the agreement and providing the upfront fee, on May 11, 2023, SANTOS emailed a representative of E.S. various fraudulent documents purporting to show that ETHOS was worth hundreds

of millions of dollars. However, each document was fake. Specifically, SANTOS emailed E.S. an annual balance sheet for Ethos titled "ETHOS ASSET MANAGEMENT INC. Annual Financial Statements for the year ended 31 December 2022." The balance sheet expressly states Ethos had approximately $2.2 billion in total assets and that a specific bookkeeping services and tax preparation company located in the Southern District of California prepared and compiled the financial statements. I have interviewed representatives from the relevant bookkeeping services and tax preparation company and reviewed relevant records obtained from the company pursuant to a grand jury subpoena. Based on the interview and review of records, the balance sheet that SANTOS sent to E.S. was not prepared or compiled by the relevant bookkeeping services and tax preparation company.

In his May 11, 2023 email to E.S., SANTOS also attached three brokerage account statements from Oanda Corporation, a foreign exchange trading platform. The statements purport to show a balance for an account associated with Ethos and Co-Conspirator Company 1 with account number ending in x512-385. One such statement with a file name "EAM_ETHOS_MT4_TRADING ACCOUNT_03-31-23" purports to show a $359,088,190.22 balance. Below is a true and correct copy of this statement with added redactions:

4

**OANDA** (/)

## My Funds

**Account Summary**

v20 Account Number 0████512-385

MT4 Server (https://oanda.secure.force.com/AnswersSupport?urlName=MT4-Server-Migration&language=en_US)OANDA-v20 Live-1

| | | | |
|---|---|---|---|
| Pricing Type | MT4 | | |
| Balance | $359,088,190.22 | Unrealized P&L | $90,996.02 |
| Margin Used | $359,000,000.00 | Realized P&L | $358,991,189.12 |
| Margin Available | $88,190.22 | NAV | $359,179,186.24 |
| Name | Atlas Ethos MT4 Trading | | Edit |
| Leverage | 50: 1 | | Edit |
| Cliim:]Enabled | | | |

I have reviewed official Oanda account documents associated with Co-Conspirator Company 1 and Ethos obtained pursuant to grand jury subpoenas. There is no Oanda account ending in x512-385 that is associated with either Ethos or Co-Conspirator Company 1. The Oanda accounts associated with Ethos and Co-Conspirator Company 1 never had a balance over $200,000. E.S. paid Ethos an upfront fee in excess of $8 million, but SANTOS never made loan disbursements as promised in the agreement between E.S. and Ethos.

To facilitate his scheme and to ensure money was available to pay back his defrauded borrowers, SANTOS obtained a $14.8 million line of credit from U.S. Financial Institution 1. For the purpose of obtaining this line of credit, SANTOS submitted false and fraudulent documents to U.S. Financial Institution 1 that inflated Ethos's net worth. On October 22, 2022, SANTOS sent an email to an officer of U.S. Financial Institution 1 attaching various Ethos related financial documents in order to qualify for the line of credit. One such document was a June 22, 2022 account statement for Ethos's account at Citibank ending in x1032 purporting to show a $104,234,147.81

5

balance. A true and correct copy of a portion of the account statement, with added redaction, sent by SANTOS is below:

Citibank CBO Services    022
P.O. Box 6201
Sioux Falls, SD 57117-6201

000
CITIBANK, N.A.
Account
███████1032
Statement Period
May 21 - Jun 22, 2022
Relationship Manager
Citibusiness Service Center
(877) 528-0990
Page 1 of 3

ETHOS ASSET MANAGEMENT, INC.
4660 LA JOLLA VILLAGE DR  Suite 100
SAN DIEGO            CA 92122

**CitiBusiness® ACCOUNT AS OF JUNE 22, 2022**

Relationship Summary:

| Checking | $104,234,147.61 |
|---|---|
| Savings | ----- |
| Checking Plus | ----- |

I have reviewed official records obtained from Citibank pursuant to a grand jury subpoena for Ethos's account ending in x1032. The official June 22, 2022 account statement for the x1032 account had a balance of $1,234,147.61.